ORIGINAL

Approved: ___J~ A. Ril___
          MICHAEL K. KROUSE / JASON A. RICHMAN
          Assistant United States Attorneys

Before:   THE HONORABLE HENRY B. PITMAN
          United States Magistrate Judge
          Southern District of New York

**19 MAG 6263**

- - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

          - v. -

ALEXEI SAAB,
     a/k/a "Ali Hassan Saab,"
     a/k/a "Alex Saab,"
     a/k/a "Rachid,"

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - X

                                    :  **SEALED**
                                    :  **COMPLAINT**
                                    :
                                    :  Violations of
                                    :  18 U.S.C. §§ 2339B,
                                    :  2339D, 371, 1425(a),
                                    :  3291, 1546(a),
                                    :  1015(a), 1001 & 2
                                    :
                                    :  COUNTY OF OFFENSE:
                                    :  NEW YORK
                                    :
                                    :

STATE OF NEW YORK      )
                       )   ss.:
COUNTY OF NEW YORK     )

          ANTHONY J. CIPRIANO, being duly sworn, deposes and says
that he is a Special Agent with the Federal Bureau of Investigation
("FBI"), and charges as follows:

**COUNT ONE**

(Provision of Material Support to a
Designated Foreign Terrorist Organization)

          1.   From at least in or about 1996, up to and including in
or about March 2019, in the Southern District of New York and
elsewhere, ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab,"
a/k/a "Rachid," the defendant, knowingly provided, attempted to
provide, and aided and abetted the provision of "material support
or resources," as that term is defined in Title 18, United States
Code, Section 2339A(b) -- to wit, tangible and intangible property,
services, expert advice and assistance, and personnel (including
himself) -- to a foreign terrorist organization, to wit, Hizballah,
which at all relevant times was designated by the Secretary of

State as a foreign terrorist organization pursuant to Section 219 of the Immigration and Nationality Act ("INA"), and is currently designated as such as of the date of the filing of this Complaint, knowing that Hizballah was a designated terrorist organization (as defined in Title 18, United States Code, Section 2339B(g)(6)), that Hizballah engages and has engaged in terrorist activity (as defined in section 212(a)(3)(B) of the INA), and that Hizballah engages and has engaged in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

(Title 18, United States Code, Sections 2339B and 2.)

**COUNT TWO**

(Conspiracy to Provide Material Support to a Designated Foreign Terrorist Organization)

2. From at least in or about 1996, up to and including in or about March 2019, in the Southern District of New York, and elsewhere, ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant, and others known and unknown, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other to provide "material support or resources," as that term is defined in Title 18, United States Code, Section 2339A(b), to a foreign terrorist organization, to wit, Hizballah, which at all relevant times was designated by the Secretary of State as a foreign terrorist organization pursuant to Section 219 of the INA, and is currently designated as such as of the date of the filing of this Complaint.

3. It was a part and an object of the conspiracy that ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant, and others known and unknown, would and did knowingly provide Hizballah with material support and resources - - to wit tangible and intangible property, services, expert advice and assistance, and personnel (including SAAB) -- knowing that Hizballah was a designated terrorist organization (as defined in Title 18, United States Code, Section 2339B(g)(6)), that Hizballah engages and has engaged in terrorist activity (as defined in section 212(a)(3)(B) of the INA), and that Hizballah engages and has engaged in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989), in violation of Title 18, United States Code, Section 2339B.

4. In furtherance of the conspiracy and to effect the illegal object thereof, ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant, and his co-

2

conspirators committed the overt acts set forth below, among others:

a. Between in or about 1996 and in or about 2005, SAAB participated in extensive Hizballah training, including in surveillance, firearms, and the production and use of explosives.

b. In or about 2003, SAAB provided Hizballah with intelligence and photographs concerning several locations SAAB had surveilled in the New York City area, including the Port Authority Bus Terminal, Grand Central Terminal, the New York Stock Exchange, 26 Federal Plaza, and local airports.

c. In or about 2005, SAAB traveled to Istanbul, Turkey and provided intelligence concerning his trip to Hizballah.

d. In or about 2005, at Hizballah's direction, SAAB attempted to murder a person he came to believe was an Israeli spy.

(Title 18, United States Code, Section 2339B.)

## COUNT THREE

(Receipt of Military-Type Training from a
Designated Foreign Terrorist Organization)

5. From at least in or about 1996, up to and including in or about March 2019, in Lebanon and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant, who is expected to be first arrested in the Southern District of New York, knowingly received military-type training from and on behalf of Hizballah, which at all relevant times was designated by the Secretary of State as a foreign terrorist organization pursuant to Section 219 of the INA, and is currently designated as such as of the date of the filing of this Complaint, knowing that Hizballah was a designated foreign terrorist organization (as defined in Title 18, United States Code, Section 2339D(c)(4)), that Hizballah engages and has engaged in terrorist activity (as defined in section 212(a)(3)(B) of the INA), and that Hizballah engages and has engaged in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989), to wit, SAAB received training in the use of weapons and in the construction and use of explosives from other members of Hizballah.

(Title 18, United States Code, Sections 2339D and 3238.)

3

## COUNT FOUR

(Conspiracy to Receive Military-Type Training from a
Designated Foreign Terrorist Organization)

6.     From at least in or about 1996, up to and including in
or about March 2019, in Lebanon and elsewhere, and in an offense
begun and committed out of the jurisdiction of any particular State
or district of the United States, ALEXEI SAAB, a/k/a "Ali Hassan
Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant, who is
expected to be first arrested in the Southern District of New York,
and others known and unknown, knowingly and intentionally
combined, conspired, confederated, and agreed together and with
each other to receive military-type training from and on behalf of
Hizballah, which at all relevant times was designated by the
Secretary of State as a foreign terrorist organization pursuant to
Section 219 of the INA, and is currently designated as such as of
the date of the filing of this Complaint.

7.     It was a part and an object of the conspiracy that ALEXEI
SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid,"
the defendant, and others known and unknown, would and did
knowingly receive military-type training from and on behalf of
Hizballah, knowing that Hizballah was a designated foreign
terrorist organization (as defined in Title 18, United States Code,
Section 2339D(c)(4)), that Hizballah engages and has engaged in
terrorist activity (as defined in section 212(a)(3)(B) of the INA),
and that Hizballah engages and has engaged in terrorism (as defined
in section 140(d)(2) of the Foreign Relations Authorization Act,
Fiscal Years 1988 and 1989), in violation of Title 18, United
States Code, Section 2339D.

8.     In furtherance of the conspiracy, ALEXEI SAAB, a/k/a
"Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the
defendant, and his co-conspirators committed the overt acts set
forth in paragraph 4 above, which is fully incorporated by
reference herein, among others.

(Title 18, United States Code, Sections 371, 2339D, and 3238.)

## COUNT FIVE

(Unlawful Procurement of Citizenship or Naturalization to
Facilitate an Act of International Terrorism)

9.     From at least in or about 2005, up to and including in
or about 2008, ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex
Saab," a/k/a "Rachid," the defendant, in the Southern District of

New York and elsewhere, knowingly procured and attempted to procure, contrary to law, the naturalization of a person to facilitate an act of international terrorism as defined in Title 18, United States Code, Section 2331, to wit, SAAB submitted a naturalization application for himself containing false statements relating to, among other things, his membership in and provision of support and resources to Hizballah.

(Title 18, United States Code, Sections 1425(a) and 2.)

## COUNT SIX

(Marriage Fraud Conspiracy)

10. From at least in or about July 2012 up to and including in or about July 2019, in the Southern District of New York and elsewhere, ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant, and others known and unknown, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, a violation of Title 8, United States Code, Section 1325(c).

11. It was a part and object of the conspiracy that ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant, and others known and unknown, knowingly would and did enter into a marriage for the purpose of evading provisions of the immigration laws.

12. In furtherance of the conspiracy and to effect the illegal object thereof, ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant, and his co-conspirators committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a. In or about July 2012, SAAB married a co-conspirator not named herein ("CC-1"), in Manhattan, New York, so that CC-1 could obtain citizenship benefits in the United States.

b. In or about March 2015, SAAB and CC-1 filed a joint petition (the "Petition") seeking to remove conditions on CC-1's residence. In the Petition, both SAAB and CC-1 falsely affirmed under penalty of perjury that their marriage "was not for the purpose of procuring an immigration benefit."

(Title 18, United States Code, Section 371.)

## COUNT SEVEN

(Citizenship Application Fraud)

13. In or about March 2015, in the Southern District of New York and elsewhere, ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant, knowingly subscribed as true under penalty of perjury, and aided and abetted and caused the subscription as true under penalty of perjury, a false statement with respect to a material fact in an application, affidavit, and other document required by the immigration laws and regulations prescribed thereunder, and knowingly presented, and aided and abetted and caused the presentation of, such an application, affidavit, and other document which contained such false statement and which failed to contain any reasonable basis in law and fact, to wit, SAAB and CC-1 jointly filed the Petition in which they falsely affirmed under penalty of perjury that their marriage "was not for the purpose of procuring an immigration benefit."

(Title 18, United States Code, Sections 1546(a) and 2.)

## COUNT EIGHT

(Naturalization Fraud)

14. In or about March 2015, in the Southern District of New York and elsewhere, ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant, knowingly made, and aided and abetted the making of, a false statement under oath, in a case, proceeding, and matter relating to, under, and by virtue of a law of the United States relating to naturalization, citizenship, and registry of aliens, to wit, SAAB affirmed, and aided and abetted CC-1's affirmance, in the Petition, under penalty of perjury, that their marriage "was not for the purpose of procuring an immigration benefit."

(Title 18, United States Code, Sections 1015(a) and 2.)

## COUNT NINE

(False Statements)

15. In or about March 2015, in the Southern District of New York and elsewhere, ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant, in a matter within the jurisdiction of the executive branch of the Government of the

6

United States, knowingly and willfully falsified, concealed, and covered up by a trick, scheme, and device a material fact, and made materially false, fictitious, and fraudulent statements and representations, and made and used a false writing and document knowing the same to contain a materially false, fictitious, and fraudulent statement and entry, and aided and abetted the same, to wit, SAAB affirmed, and aided and abetted CC-1's affirmance, under penalty of perjury, the false statement contained in the Petition.

(Title 18, United States Code, Sections 1001 and 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

16. I am a Special Agent with the FBI, currently assigned to the New York Joint Terrorism Task Force (the "JTTF"). The focus of my counterterrorism and counterintelligence efforts has been investigating and disrupting terrorist activities by Hizballah and, in particular, the Islamic Jihad Organization ("IJO"). I have also been involved in the investigation of immigration and fraud related offenses. I have been personally involved in the investigation of this matter, and I base this affidavit on that personal experience, as well as on my conversations with other law enforcement agents, and my examination of various reports and records. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## OVERVIEW

17. The FBI's investigation has revealed that ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant, was a member of the IJO, which is a sophisticated, highly compartmentalized component of Hizballah responsible for the planning, preparation, and execution of intelligence, counterintelligence, and terrorist activities for Hizballah around the world. Hizballah first recruited SAAB in approximately 1996, and he initially conducted Hizballah missions inside Lebanon. In approximately 2000, SAAB transitioned to membership in the IJO. Thereafter, SAAB participated in extensive training in IJO tradecraft, weapons, and military tactics, including in the construction of explosive devices. SAAB also conducted numerous operations for the IJO. For example, SAAB attempted to shoot, at close range, a man he later understood to be an Israeli spy, and

7

traveled to Istanbul, Turkey, to gather intelligence for the IJO. SAAB also executed IJO operations inside the United States. For example, SAAB conducted extensive surveillance of dozens of locations in New York City, and provided detailed information on these locations, including photographs, to the IJO, for use in potential attacks. SAAB's reports to Hizballah included the composition of particular structures, designed to allow Hizballah and the IJO to maximize destruction of their targets. SAAB conducted similar intelligence gathering in a variety of large American cities, including Boston and Washington, D.C.

## HIZBALLAH AND THE ISLAMIC JIHAD ORGANIZATION

18. Based on my training and experience, my participation in this and related investigations, and my review of publicly available documents, reports, and other materials, I understand the following, in substance and in part:

a. Hizballah is a Lebanon-based Shia Islamic organization with political, social, and terrorist components. Hizballah was founded in the early 1980s with support from Iran after the 1982 Israeli invasion of Lebanon, and its mission includes establishing a fundamentalist Islamic state in Lebanon. In 1997, the U.S. Department of State (the "State Department") designated Hizballah a Foreign Terrorist Organization, pursuant to Section 219 of the INA, and it remains so designated today. In 2001, pursuant to Executive Order 13,224, the U.S. Department of the Treasury designated Hizballah a Specially Designated Global Terrorist entity. In 2010, State Department officials described Hizballah as the most technically capable terrorist group in the world and a continued security threat to the United States.

b. The IJO, which is also known as the External Security Organization and "910," is a component of Hizballah responsible for the planning and coordination of intelligence, counterintelligence, and terrorist activities on behalf of Hizballah outside of Lebanon. IJO operatives are typically assigned a Lebanon-based "handler," sometimes referred to as a mentor, responsible for providing taskings, debriefing operatives, and arranging training. IJO often conducts targeted operations in stages, sending waves of one or more operatives with separate taskings such as surveillance, obtaining and storing necessary components and equipment, and attack execution.

c. Since Hizballah's formation, the organization has been responsible for numerous terrorist attacks that have killed hundreds, including the 1983 bombing of the United States Marine barracks in Lebanon, which killed 241 Marines; the 1983 bombing of

the United States Embassy in Beirut, which killed 24 people; the 1985 hijacking of TWA Flight 847, which killed one U.S. citizen; the 1992 bombing of the Israeli Embassy in Argentina, which killed 29 people; and the 1994 bombing of a Jewish cultural center in Buenos Aires, which killed 85 people.

d.     In July and August 2006, Hizballah and Israel engaged in armed conflict (the "2006 Lebanon War"), resulting in numerous casualties, after an incident on or about July 12, 2006 when Hizballah attacked Israeli Defense Force ("IDF") personnel. A ceasefire brokered by the United Nations went into effect on August 14, 2006.

e.     In January 2012, Hussein Atris, an IJO operative with dual Lebanese-Swedish citizenship, was detained in Thailand as he tried to board a flight at a Bangkok airport.    Atris subsequently led law enforcement personnel to a commercial building near Bangkok that housed a cache of nearly 10,000 pounds of urea-based fertilizer and 10 gallons of ammonium nitrate, which are chemicals that I know, based on my training and experience, can be used to construct explosives.    The ammonium nitrate was stored in first aid ice packs.

f.     In July 2012, Mouhamad Hassan Mouhamad El Husseini, an IJO operative with dual Lebanese-French citizenship, detonated explosives on a bus transporting Israeli tourists in the vicinity of an airport in Burgas, Bulgaria.    Six people were killed and 32 others were injured.    Law enforcement authorities recovered three fraudulent, purportedly U.S.-based, driver's licenses during the investigation, subsequently linked the attack to the IJO, and determined that ammonium nitrate was an active ingredient in the explosives.

g.     Also in July 2012, Hossam Taleb Yaacoub, an IJO operative with dual Lebanese-Swedish citizenship, was arrested after conducting surveillance of Israeli tourists in the vicinity of an airport in Larnaca, Cyprus.    Law enforcement authorities seized from Yaacoub a notebook containing coded entries relating to, among other things, Israeli tour buses.    In March 2013, Yaacoub was convicted of crimes in Cyprus relating to these activities on behalf of the IJO.

h.     In May 2015, Hussein Bassam Abdallah, an IJO operative with dual Lebanese-Canadian citizenship, was arrested in Cyprus after Cypriot authorities seized from an apartment rented by Abdallah approximately 8.2 tons of ammonium nitrate, at least some of which was stored in First Aid ice packs.    Abdallah

possessed a copy of a fraudulent passport at the time of his arrest, and he was subsequently convicted of crimes in Cyprus relating to these activities on behalf of the IJO.

i. In June 2017, two IJO operatives were arrested in the United States and charged with terrorism-related offenses in the Southern District of New York. In May 2019, a jury convicted one of those two IJO operatives on all counts.

## COOPERATING WITNESS-1 ("CW-1")

19. Based on my participation in this investigation, including my participation in interviews of an individual ("CW-1"), my review of reports concerning interviews of CW-1, and my conversations with other FBI agents concerning CW-1, I have learned the following:

a. CW-1 is a former IJO member who was arrested in the United States in or about June 2017. CW-1 has since pleaded guilty to a number of terrorism-related offenses pursuant to a cooperation agreement with the Government.

b. CW-1 was recruited into the IJO in or about 2007, and remained an IJO member until in or about 2016.

c. CW-1 received extensive training from the IJO as a bomb-maker, and developed a significant degree of technical sophistication in the area. CW-1 reported to multiple Hizballah operatives who were responsible for his training or tasking, also known as his "handlers." As part of his IJO training in Lebanon, CW-1 was transported to training sites by other Hizballah affiliates, including in vehicles with blacked out windows, and he participated in, among other things, surveillance, counter-surveillance, and military training. Among other things, CW-1 learned how to construct and detonate explosive devices.

d. CW-1 completed multiple operations on behalf of the IJO, including in Panama and Thailand. In Panama, the IJO tasked CW-1 with surveilling numerous potential targets for future IJO attacks. In Thailand, CW-1 removed explosive material from an IJO safe-house believed to be under surveillance.

## SAAB'S BACKGROUND

20. Based on my review of documents and information maintained by federal authorities in the United States, I am aware of the following, in substance and in part:

10

a. ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant, is a 42-year-old naturalized United States citizen.

b. On or about November 18, 2000, SAAB lawfully entered the United States using a Lebanese passport.

c. On or about December 6, 2005, SAAB applied for naturalized citizenship with the Immigration and Naturalization Service. In his application for naturalization, SAAB affirmed, under penalty of perjury, that he had never been "a member of or in any way associated with . . . a terrorist organization."

d. On or about August 26, 2008, SAAB became a naturalized citizen of the United States.

e. Between on or about November 18, 2000, and on or about June 18, 2017, SAAB has traveled to Lebanon approximately 10 times.

## SAAB'S RECRUITMENT AND INITIAL TRAINING BY HIZBALLAH AND THE IJO

21. I and other agents of the FBI have interviewed ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant, in person a total of approximately 11 times between on or about March 14 and July 8, 2019 (collectively, the "SAAB Interviews"). Based on my participation in the SAAB Interviews and my review of reports of the SAAB Interviews, I have learned the following, in substance and in part:

a. SAAB confirmed at each of the SAAB Interviews that he was participating in the interview voluntarily.

b. SAAB was recruited into Hizballah in or about 1996 when SAAB met a fellow student ("Student-1") at the University of Lebanon (the "University"). Student-1 was a member of Hizballah's student organization at the University and Student-1 introduced SAAB to a Hizballah member ("Handler-1") during a study group session. Handler-1 then recruited SAAB into Hizballah and became SAAB's first handler, responsible for SAAB's initial training and tasking on behalf of Hizballah.[1]

---

[1] Based on my training and experience, including my review of reports of interviews with CW-1 (*see supra* ¶ 19(c)), I have learned that IJO operatives typically have one or more "handlers" who are responsible for their training and operations.

11

c. Between approximately 1996 and 2000, SAAB met with Handler-1 at least 15 times. During this time period, Handler-1 assigned SAAB his initial Hizballah operations. More specifically, Handler-1 tasked SAAB with observing and reporting on the actions and movements of Israeli and Southern Lebanese Army soldiers in Yaroun, Lebanon. Handler-1 told SAAB to observe, among other things, patrol schedules and formations, procedures at security checkpoints, and the description of vehicles used by soldiers, including whether the vehicles appeared to be armored. At the conclusion of each of his trips to Yaroun to conduct this tasking, SAAB wrote a report about what he had observed and provided the report to Handler-1.

d. In approximately 1999, SAAB attended his first Hizballah training. This training was focused on the use of firearms, and, during the course of this training, SAAB handled and fired an AK-47, an M16 rifle, and a pistol, and threw grenades.[2]

### SAAB'S TRAINING ESCALATES AND HE LEARNS TO CONSTRUCT EXPLOSIVES

e. At some point before SAAB moved to the United States, Handler-1 introduced SAAB to another man who then became one of SAAB's primary handlers.[3] SAAB was eventually introduced to two additional handlers, and he interacted with all of these handlers over the course of the ensuing years.[4]

f. Handler-2 at first tasked SAAB in a similar manner to Handler-1, and had SAAB report on troop movements and other information from Yaroun.

---

[2] Based on my training and experience, I have learned that the AK-47 and M16 assault rifles are firearms capable of automatically firing more than one shot without manual reloading.

[3] Based on my review of documents maintained by federal authorities in the United States, I have learned that SAAB first moved to the United States on or about November 18, 2000. *See supra* ¶ 20(b). Thereafter, SAAB traveled back to Lebanon approximately 10 times. *See supra* ¶ 20(e).

[4] SAAB has at times conflated handlers when describing which handler tasked him with particular operations. This affidavit uses the term "Handler-2" to refer to the three handlers, other than Handler-1, whom SAAB dealt with during his time in the IJO.

12

g. Handler-2 provided SAAB with a method of electronic communication that the IJO would use to contact SAAB while he was in the United States. More specifically, Handler-2 told SAAB that if Hizballah ever needed him to return to Lebanon, SAAB would receive an email to his personal email account that would appear to be spam. There would be a coded signal concealed in either the subject or the body of the message that would alert SAAB of the need to return to Lebanon.

h. Handler-2 also provided SAAB with a secure communications procedure through which SAAB could contact Handler-2 when SAAB returned to Lebanon from the United States. More specifically, Handler-2 provided SAAB with a phone number and numeric code, and Handler-2 instructed SAAB to call the phone number and key in the code to inform Handler-2 that SAAB had returned to Lebanon. After Handler-2 received the code from SAAB, Handler-2 would contact SAAB on his personal cellphone or at his family home in Yaroun, Lebanon.

i. SAAB's training continued between 2000 and 2005, and SAAB at some point realized that he was being trained for Hizballah's external operations unit—*i.e.*, the IJO. When SAAB traveled to training sites, he waited at a predetermined location in Beirut, where, like CW-1, *see supra* ¶ 19(c), he was picked up by a white van with blacked out windows. Inside the van, each row of seats was separated by curtains. Upon arrival at a training location, SAAB and the other trainees exited, while wearing masks, one by one, and entered a classroom. In the classroom, SAAB and the other trainees were separated by partitioned cubicles, and they were not allowed to talk amongst themselves or share any personal information. During SAAB's training, he and the other trainees used fictitious names. SAAB primarily went by "Rashid."

j. SAAB attended training for surveillance and counter-surveillance, including, among other things, field exercises in Beirut and classroom instruction. In addition, SAAB developed tradecraft in conducting surveillance and in taking videos and photographs for the IJO without drawing the attention of law enforcement authorities. For videos, SAAB learned to start by recording an unrelated subject before panning the camera to the object of his surveillance. SAAB also took videos from a high altitude and different zoom ranges to show perspective relevant to Hizballah. For photographs, SAAB learned to position an unrelated subject as the focus point of the picture, with the true object of surveillance in the background. SAAB would also often pose people in front of the intended objects of his surveillance, to provide perspective and shield his true purpose from law enforcement.

13

k.     In 2004 and 2005, SAAB attended explosives training in Lebanon.   The training included detailed instruction in, among other things, triggering mechanisms, explosive substances, detonators, and the assembly of circuits.  The explosives training lasted for several days over the course of a three-week period. Portions of the training took place in an underground workshop, and the training included instruction on the various shapes of explosive charges and their most effective uses, including the types most effective against certain Israeli targets.  SAAB also learned about the construction of detonators, circuit boards, and triggering mechanisms.

l.     During the course of the explosives training, SAAB created a "sticky bomb" which he then tested in the mountains outside of Beirut.  SAAB's device was connected to wires with a metal tube attached, which was then plugged into C4 explosives. SAAB's device detonated successfully.  SAAB and the other trainees traveled by van to a safehouse near the mountains for this portion of their training.

m.     During the course of the SAAB Interviews, SAAB drew the below diagrams of certain explosives that he had learned to construct:

Explosive 1          Explosive 2          Explosive 3



n.     During his explosives training, which took place shortly after the death of former Lebanese Prime Minister Rafic Hariri, SAAB was presented with photographs depicting the scene of

14

Hariri's death.[5] SAAB and the other trainees were then required to analyze the photographs to determine where the center of the blast occurred and the size, type, and triggering mechanism of the explosive that was used.

o. In approximately April 2005, SAAB departed Lebanon and flew through Turkey back to the United States. While traveling, SAAB was stopped and interviewed at the airport in Istanbul, Turkey, due to the detection of an explosive substance on his luggage or clothing. SAAB had just completed his explosives training prior to traveling, which SAAB believed resulted in the detection.

22. Based on my review of reports and records maintained by federal authorities in the United States, I have learned the following, in substance and in part:

a. On or about April 14, 2005, ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant, arrived at John F. Kennedy International Airport, in Queens, New York, where he was interviewed by law enforcement (the "JFK Interview").

b. During the course of the JFK Interview, SAAB acknowledged that he had been interviewed by Turkish authorities concerning the discovery of explosive traces on his carry-on luggage. SAAB denied any knowledge of why his luggage tested positive.

23. Based on my conversations with an FBI Special Agent Bomb Technician ("SABT-1"), and my review of FBI and other law enforcement reports, I have learned that SABT-1 reviewed the diagrams made by ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant, depicted above, and concluded the following, in substance and in part:

a. SABT-1 assessed Explosive 1 as a viable victim-actuated device, designed to detonate when an action was taken by a potential victim.

---

[5] Based on my review of publicly available information, I have learned that Hariri was reported dead on or about February 14, 2005.

b.    SABT-1 assessed Explosive 2 as another viable victim-actuated device, designed to detonate when the briefcase was lifted off the surface by a potential victim.

c.    SABT-1 assessed Explosive 3 as a viable improvised mortar device, meaning it is command initiated and able to detonate on a time delay.

## SAAB GATHERS INTELIGENCE FOR THE IJO ON POTENTIAL TARGETS TO ATTACK IN NEW YORK CITY

24.    Based on my participation in the SAAB Interviews and my review of reports of the SAAB Interviews, I have learned the following, in substance and in part:

a.    In or about 2003, Handler-2 told ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant, to surveil certain "hot spots" in New York City and to report intelligence about them to the IJO.    SAAB then conducted surveillance and intelligence gathering for the IJO of dozens of locations in New York City and elsewhere.

b.    SAAB explained that the IJO had trained SAAB so that his mindset was that he should always be gathering intelligence, and he was on "autopilot" to collect intelligence at any opportunity, including while he was in New York City.    SAAB explained that he would often take photographs that had a "dual purpose," both as a tourist interested in certain landmarks and to provide the photographs and information back to the IJO for intelligence gathering.

c.    SAAB focused on structural weaknesses of the locations he surveilled to determine how a future attack could cause the most destruction—i.e., he sought to learn how to maximize damage if the IJO later bombed a location.    Among other information, SAAB focused on the materials used to construct a particular target, how close in proximity one could get to a target, and site weaknesses or "soft spots" that the IJO could exploit if it attacked a location in the future.

d.    SAAB understood that the information he provided to the IJO would be used to calculate the size of a bomb needed to target a particular structure and the ideal location in which to place explosive devices to maximize damage.    For example, SAAB provided information on how to target bridges to best allow the IJO to "disable" them and to prevent them from being used.    To that end, SAAB looked for weak points in the bridge's structure, and the photographs he took would focus on structural details such

16

as the main joints, the towers, and the cables. *See, e.g., infra* ¶¶ 25, 27, 31 (depicting surveillance photographs the FBI recovered from SAAB's electronic devices).

e. In approximately 2003 in Lebanon, SAAB was transported to a safehouse where he met with Handler-2. There, Handler-2 told SAAB to prepare a detailed guide to New York City. Over the course of the following two days, SAAB wrote an approximately seven to 10 page report (the "Report") on New York City. The first page of the Report was a hand-drawn map with specific locations annotated by number. The second page of the Report had a legend, which indicated how the numbers corresponded to locations. The rest of the Report had a detailed summary of each location. SAAB included, among other locations, the following in the Report:

> i. Federal, state, and local government buildings, including 26 Federal Plaza;
>
> ii. United Nations headquarters;
>
> iii. The Statute of Liberty and Ellis Island;
>
> iv. Rockefeller Center;
>
> v. Wall Street and the New York Stock Exchange;
>
> vi. Times Square;
>
> vii. The Empire State Building;
>
> viii. Herald Square and Macy's in Midtown;
>
> ix. Local airports, including John F. Kennedy International Airport, LaGuardia Airport, and Newark Liberty International Airport; and
>
> x. Local tunnels and bridges, including the Lincoln Tunnel, Holland Tunnel, Brooklyn Battery Tunnel, Brooklyn Bridge, George Washington Bridge, Verrazzano-Narrows Bridge, Throgs Neck Bridge, and Goethals Bridge.

f. SAAB included in the Report such details as directions to the local airports, the number of terminals at the local airports, and which terminals were for international or domestic travel. After SAAB completed the Report, Handler-2 asked SAAB certain clarifying questions.

17

g.      Finally, on the same trip to Lebanon during which he wrote the Report, SAAB provided Handler-2 with a series of photographs corresponding to the locations he detailed in the Report.

25.  Based on my involvement in this investigation, including my participation in the search of the residence of ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant, and review of reports concerning the same, I have learned the following, in substance and in part:

a.      On or about March 14, 2019, pursuant to a search warrant authorized by a United States Magistrate Judge in the District of New Jersey, law enforcement performed a search (the "SAAB Residence Search") of SAAB's residence in the vicinity of Morristown, New Jersey.

b.      Among other things, law enforcement recovered a number of electronic devices (the "SAAB Devices") from the SAAB Residence.   A search warrant was then obtained for the SAAB Devices.   The FBI has identified photographs on the SAAB Devices that depict images matching those that SAAB described as the kind he provided to the IJO and which show locations in the Report. For example, the following photographs have been recovered from the SAAB Devices:

Brooklyn Bridge



Verrazano-Narrows Bridge



26 Federal Plaza and other Government Buildings



George Washington Bridge



## SAAB GATHERS ADDITIONAL INTELLIGENCE IN THE
## UNITED STATES FOR THE IJO

26. In addition to his IJO Operations in New York City, ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant, has also conducted other surveillance for the IJO in preparation for a potential attack in other cities in the United States. More specifically, based on my participation in the SAAB Interviews and my review of photographs and videos recovered from the SAAB Devices, I have learned the following, in substance and in part:

a. SAAB admitted that he took photographs in Boston, Massachusetts, and Washington, D.C., among other cities, that were of interest to Hizballah. More specifically, SAAB recalled taking photographs of buildings and locations in Boston including, but not limited to, Quincy Market and the Prudential Center. In Washington, D.C., SAAB recalled taking photographs of buildings and locations including the Capitol Building, Congress, and the White House.

27. Based on my training, experience, and involvement in this investigation and others, including my review of the SAAB Devices, I have learned the following, in substance and in part:

a. The FBI recovered photographs and videos from the SAAB Devices that depict images and videos matching those that SAAB described as the kind he provided to IJO and that depict landmarks in Boston and Washington, D.C., among other locations. For example, the following photographs have been recovered:

Prudential Center in Boston, Massachusetts

 

Various landmarks in Washington, D.C.



b.    In addition, the following are screenshots from videos recovered from the SAAB Devices:

Fenway Park in Boston, Massachusetts



Aerial views from the Prudential Center in Boston, Massachusetts



United States Capitol in Washington, D.C.



Lincoln Memorial in Washington, D.C.



**SAAB GATHERS INTELLIGENCE IN TURKEY FOR THE IJO**

28. Based on my participation in the SAAB Interviews and my review of reports of the SAAB Interviews, I have learned the following, in substance and in part:

a. In approximately January 2005, ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant, traveled from Lebanon to Istanbul, Turkey for a three to five day trip. Prior to his trip, SAAB met with Handler-2, and Handler-2 told SAAB to learn enough detail about the city so that SAAB could later provide information sufficient to describe in detail the city to someone who had never been there before.

22

b.    SAAB went to a travel agent and received a quote on the trip to Turkey. SAAB obtained funding from Hizballah for the trip.[6]   SAAB then went to Istanbul, where he took photos and possibly purchased a tourist map to take back to Lebanon.   Among other locations, SAAB visited the Blue Mosque, palaces, and street markets.

c.    After his trip to Istanbul, SAAB flew from Istanbul to Damascus, Syria, where SAAB met Handler-2 in the lobby of the Al-Safir Hotel.   SAAB and Handler-2 then traveled at night from Damascus back to Beirut in a black BMW with heavily tinted windows. They were stopped at the border between Syria and Lebanon, and Handler-2 provided an identification document to the Syrian intelligence officers there.   After the officers consulted with their superiors, Handler-2 and SAAB were waved through.

29.    Based on my review of the Lebanese Passport of ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant, I have learned the following, in substance and in part:

a.    On or about January 10, 2005, SAAB obtained a Visa for entry to Turkey, and on or about January 15, 2005, SAAB entered Turkey:



30.    Based on my involvement in this investigation, including my participation in the execution of the SAAB Residence Search and

---

[6] According to SAAB, either Handler-2 or one of SAAB's Hizballah instructors paid for this trip.

review of reports concerning the same, I have learned the following, in substance and in part:

a. During the course of the SAAB Residence Search, law enforcement recovered, among other things, an "Istanbul City Guide," containing, among other things, a map of Istanbul (the "Istanbul Map") with several landmarks highlighted:

  

b. Based on my review of the Istanbul Map, I have learned, among other things, that there is what appears to be a hand-drawn circle around the "Blue Mosque," the same location that ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant, admitted visiting during his operation to Istanbul for IJO. *See supra* ¶ 28(b).

31. Based on my participation in the SAAB Devices Search and review of reports concerning the same, I have learned the following, in substance and in part:

a. On a hard drive searched during the SAAB Devices Search was a folder titled "05-01-14~16 Istanbul." There are approximately 208 photographs and 9 videos contained within this folder, including the following:

 



**SAAB ATTEMPTS TO MURDER A SUSPECTED ISRAELI SPY IN LEBANON**

32. Based on my participation in the SAAB Interviews and my review of reports of the SAAB Interviews, I have learned the following, in substance and in part:

a. During the course of the surveillance training of ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant, between in or about 2003 and in or about 2005, SAAB attempted to murder a man he later understood to be an Israeli spy.

b. More specifically, around this time, one of SAAB's surveillance instructors ("Instructor-1") instructed SAAB to steal a particular car (the "Mercedes") from a particular location. SAAB was given a key that appeared to be a universal key capable of accessing multiple cars, and then proceeded to steal the Mercedes and deliver it to Instructor-1. A few days later, Instructor-1 instructed SAAB to meet him at a safehouse where Instructor-1 picked up SAAB in the Mercedes. When SAAB was in the Mercedes, Instructor-1 told SAAB to reach under the passenger's seat of the car. Under the seat, SAAB removed a plastic bag containing a silver firearm with an attached silencer.

c. SAAB and Instructor-1 then drove approximately 10 minutes to a field outside of Beirut. A small white van (the "Van") was parked in the field, and Instructor-1 parked the Mercedes behind the Van. Instructor-1 then instructed SAAB to walk up to the passenger's side of the Van and shoot the person inside "twice in the belly" and "once in the head."

d. SAAB exited the Mercedes, walked to the Van, and pointed his firearm at the Van's driver (the "Driver"). The Driver cried out twice, in sum and substance, that it "wasn't him" and raised his hands in front of his face. SAAB then pulled the trigger twice, but the gun did not fire.

e. Instructor-1 waved SAAB to get back into the Mercedes, and they fled the scene. SAAB later came to believe that the Driver was a suspected Israeli spy.

## SAAB'S HIZBALLAH PROPAGANDA

33. Based on my training, experience, and involvement in this investigation and others, including my participation in the SAAB Devices Search and review of reports concerning the same, and my review of publicly available information, I have learned the following, in substance and in part:

a. On the SAAB Devices, ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant, had, among other things, a series of photographs, which depict what appears to be a rally in Lebanon. One of those photographs appears to depict the current Secretary General of Hizballah, Hassan Nasrallah:



b. In addition, SAAB appears to have saved on the SAAB Devices several videos depicting Hizballah propaganda. For example, the following are screen shots from videos depicting Nasrallah, which are saved on the SAAB Devices and appear to have been aired by Al-Manar television[7] which, based on my training and experience, I know to be a Lebanese satellite television station affiliated with Hezbollah that the Treasury Department has designated a Specially Designated Global Terrorist Entity:

---

[7] I believe these videos are from Al-Manar television based on, among other things, my familiarity with the logo for Al-Manar which appears in the upper right corner of the screen shots and videos.





### SAAB's Fraudulent Marriage and Associated Offenses

34. As set forth below, I have also been involved in the investigation of ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant, CC-1, and others known and unknown, relating to their efforts to obtain United States citizenship for CC-1 through CC-1's fraudulent marriage to SAAB, a United States citizen. Among other things, this investigation has revealed that (a) SAAB has told others he was paid to marry CC-1 so that CC-1 could apply for naturalized citizenship in the United States based on their marriage, *see infra* ¶ 36(b); (b) CC-1 falsified an affidavit for another individual ("CC-2") and that affidavit was submitted in connection with CC-1's application for naturalization, *see infra* ¶ 39; and (c) SAAB has confessed to law enforcement that he was paid to marry CC-1 so that CC-1 could apply for United States citizenship, *see infra* ¶ 40.

27

## Relevant Applications and Timeline

35.   Based on my review of documents obtained from the United
States   Department   of   Homeland   Security,   Citizenship   and
Immigration Services ("DHS"), I have learned the following, in
substance and in part:

a.   In or about 2005, CC-1, a French citizen, initially
entered the United States under the Visa Waiver Program.[8]

b.   In or about 2009, CC-1 obtained an F1 student visa
to attend college in Manhattan, New York.

c.   On or about July 13, 2012, ALEXEI SAAB, a/k/a "Ali
Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant,
married CC-1.   SAAB was a dual U.S.-Lebanese citizen.

d.   On or about October 9, 2012, CC-1 applied for
conditional residency in the United States on the basis of her
marriage to SAAB.

e.   On or about March 13, 2015, SAAB and CC-1 filed the
Petition, seeking to remove conditions on CC-1's residence *i.e.*,
seeking to obtain United States citizenship for CC-1.[9]   In the
Petition, both SAAB and CC-1 affirmed under penalty of perjury
that their marriage "was not for the purpose of procuring an
immigration benefit."

## The Origins of the Marriage Fraud Conspiracy in 2011

36.   On or about April 10, 2018, a United States Magistrate
Judge in the Southern District of New York authorized the execution
of search warrants (the "Search Warrants") on three email accounts:

---

[8] Based on my review of publicly available information, I have
learned that the Visa Waiver Program is a program of the United
States Government that allows citizens of specific countries to
travel to the United States for up to 90 days for tourism,
business, or while in transit, without having to obtain a visa.

[9] Based on my training and experience, I have learned that if an
individual receives conditional permanent resident status based
on, among other things, marriage, it is valid for a certain period
of time, and an individual must then file a petition, such as the
Petition, to remove conditions on permanent resident status or
risk losing lawful status entirely.

two used by ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant, and one used by CC-1. Based on my review of materials obtained from execution of the Search Warrants, I have learned the following, in substance and in part:

a.    On or about July 25, 2011, CC-1 received an email from a third individual which read, in substance and in part, "First, you need=to see what your options for staying here are.  I would say at this p=int, you are left with a marriage for papers. If you don't find such an arrangement and have to leave, I will still help you. . . . I love you."[10]

b.    Several times in 2012, SAAB emailed himself documents containing what appear to be his own WhatsApp conversations with another individual ("Individual-1").[11]  Based on my review of draft translations[12] of certain of these conversations, I have learned the following, in substance and in part:

i. On or about May 26, 2012, SAAB wrote to Individual-1, "Will you marry me?  Don't mull it over, either yes or no."  Individual-1 responded, "Yes."

ii. On or about June 8, 2012, SAAB wrote to Individual-1, "Will you marry me?," and Individual-1 responded, "Sure."  SAAB then wrote, "You have not yet changed your mind?," and Individual-1 replied, "No way."

iii. On or about June 23, 2012, SAAB wrote to Individual-1, "I am going in a short while to see my female friend and her female friend -- the one I told you about, to find out what's the story."  Later on that same day, SAAB wrote, "Are you jealous for me?  To feel me with another, even though it is only ink on paper?"

---

[10] All typographical errors are contained in the original email.

[11] The WhatsApp conversations list a month and day in the text, but not a year.  I believe that the conversations took place in 2012 because (a) SAAB emailed them to himself in 2012 and (b) the file names associated with the conversations appear to identify the chats in a year-month-date format, which indicates they were from 2012.

[12] The original conversations took place in Arabic.  The below is based on a preliminary translation of these conversations prepared by an FBI linguist, and is subject to further review.

iv. On or about July 2, 2012, SAAB wrote to Individual-1 (ellipsis in original), "I am unable to decide. . . . Whether to take the step with that female or not -- marriage." Later on that same day, SAAB wrote, "But the idea that someone will be called my wife is annoying me. . . . Although she has slight resemblance to you--:)." Later that same day, SAAB continued, "Other than that, I need the money from any source . . . and the interview tomorrow was through her." Finally, Individual-1 asked SAAB, "You'll be living with her, right? -- so the story looks normal." SAAB replied, "Not necessarily."

v. On or about July 3, 2012, SAAB wrote to Individual-1, "I only met her twice -- one time we spoke and one time with the attorney for me to ask questions." Individual-1 responded, "And she is arranging some work for you." Later that same day, SAAB wrote, "And, I may not even see her once a week. I told you, she has a guy -- and he has money."

vi. On or about July 10, 2012, the following exchange took place:

| | |
|---|---|
| Individual-1: | Two years for how much, Ali? |
| SAAB: | 25,000.00 . |
| Individual-1: | They were 10,000. |
| SAAB: | 10,000 at first -- |
| SAAB: | -- and 10,000 when she gets it. |
| SAAB: | And if you take into account the house rent difference, it becomes 30,000. |
| Individual-1: | Well, what does the house rent have to do with this? |
| Individual-1: | You will live together? |
| SAAB: | We have to live together. I will have my room with its own bath. |

c. On or about September 27, 2012, CC-1 emailed a copy of a marriage certificate (the "Marriage Certificate") to another individual. Based on my review of the Marriage Certificate, I

30

have learned, in substance and in part, that SAAB and CC-1 were married on or about July 13, 2012, at the Office of the City Clerk in Manhattan, New York.

## The 2015 Petition and Affidavits

37. Based on my review of materials received from DHS, I have learned the following, in substance and in part:

a. On or about March 13, 2015, ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant, and CC-1, jointly filed the Petition seeking to obtain naturalized citizenship for CC-1.

b. The basis for the Petition was SAAB's marriage to CC-1. Specifically, SAAB and CC-1 jointly filed the Petition, and they checked the box indicating that "[CC-1]'s conditional residence is based on my marriage. . . . to a U.S. citizen or permanent resident, and I am filing this joint petition together with [m]y spouse."

c. The Petition attaches affidavits from individuals purporting to know both SAAB and CC-1, in which the affiants attested that their marriage was genuine. One such affidavit (the "CC-2 Affidavit") is from an individual ("CC-2") whose signature appears on the CC-2 Affidavit dated February 28, 2015.

d. The CC-2 Affidavit states, in part:

i. "I have known Ali Saab for more than 5 years now. He was a regular at my restaurant and we slowly became good friends. He introduced me to his wife, [CC-1], when they started dating about 3 and half years ago."

ii. "They come to my restaurant frequently and [CC-1] has become close friends with my fiancé."

iii. "Ali and [CC-1] were part of the close group of friends I invited for the grand opening of my new restaurant in Harlem last year and they are also invited to my upcoming wedding celebration in Morocco this year in August."

e. Both SAAB and CC-1 signed the Petition under penalty of perjury. Specifically, they each affirmed the following:

31

> I certify, under penalty of perjury under the
> laws of the United States of America, that
> this petition and the evidence submitted with
> it is all true and correct. If conditional
> residence was based on a marriage, I further
> certify that the marriage was entered in
> accordance with the laws of the place where
> the marriage took place and was not for the
> purpose of procuring an immigration benefit.

38. Based on my review of material obtained from execution
of the Search Warrants, I have further learned that, on or about
February 25, 2015, CC-1 emailed an individual whose email address
matches CC-2's name. CC-1's email stated, "Here it is. Feel free
to make any changes," and attached two documents. One of the
attachments appears to be the CC-2 Affidavit, containing the
language quoted in Paragraph 37(d), above.

39. On or about February 27, 2018, other law enforcement
agents interviewed CC-2. Based on my review of a report of that
interview, I have learned the following, in substance and in part:

a. After being shown a photograph of ALEXEI SAAB,
a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the
defendant, CC-2 identified SAAB as an individual he had met on
only approximately two occasions, both in 2015. CC-2 was unable
to recall SAAB's first or last names.

b. CC-2 and CC-1 were friends, and CC-1 introduced CC-
2 to SAAB. CC-2 recalled meeting SAAB at CC-2's restaurant, which
is located in Manhattan, New York.

c. CC-2 identified the signature on the CC-2 Affidavit
as his own, and confirmed that his last name was misspelled on the
CC-2 Affidavit.

d. CC-2 recalled that CC-1 came to CC-2's restaurant
in Manhattan and asked CC-2 to sign the CC-2 Affidavit. The
information on the CC-2 Affidavit was already filled out when CC-
2 reviewed it. The facts in the CC-2 Affidavit were false, and
CC-2 could not honestly attest to the fact that the marriage
between SAAB and CC-1 was genuine.

e. Although the CC-2 Affidavit was notarized, CC-2 did
not recall signing it in the presence of a notary public.

32

SAAB Admits That His Marriage to CC-1 Is Fraudulent

40. Based on my participation in the Saab Interviews, my conversations with other law enforcement officers about these interviews, and my review of reports of these interviews, I have learned the following, in substance and in part:

a. ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant, proposed to CC-1 that they stage a marriage so that CC-1 could obtain her United States citizenship, and offered to marry CC-1 in exchange for money.

b. CC-1 agreed to pay SAAB $20,000 in exchange for SAAB agreeing to marry her. CC-1's first payment to SAAB was $5,000 in cash, and she paid the rest in smaller increments.

c. SAAB maintained a bedroom in CC-1's apartment, which he went to almost every weekend.

d. SAAB and CC-1 had recently discussed ending their arrangement because CC-1 had not yet received her citizenship.

WHEREFORE, deponent prays that a warrant be issued and that ALEXEI SAAB, a/k/a "Ali Hassan Saab," a/k/a "Alex Saab," a/k/a "Rachid," the defendant, be arrested and imprisoned or bailed, as the case may be.

ANTHONY J. CIPRIANO
Special Agent
Federal Bureau of Investigation

Sworn to before me this
8th day of July 2019.

THE HONORABLE HENRY B. PITMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK